## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JILL A. HOVATER,                           )        CASE NO. 1:12-CV-3077
                                           )
            Plaintiff,                     )
                                           )        MAGISTRATE JUDGE
            v.                             )        VECCHIARELLI
                                           )
CAROLYN W. COLVIN,                         )
    Acting Commissioner of Social          )
    Security,                              )        **MEMORANDUM OPINION AND**
                                           )        **ORDER**
            Defendant.                     )

Plaintiff, Jill A. Hovater ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying

her applications for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a) and for Period of Disability ("POD") and

Disability Insurance Benefits ("DIB") under the Act, 42 U.S.C. §§ 416(i), 423.  This case

is before the undersigned United States Magistrate Judge pursuant to the consent of

the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set

forth below, the Commissioner's final decision is REMANDED for proceedings

consistent with this Opinion and Order.

### I.    PROCEDURAL HISTORY

On March 2, 2009, Plaintiff filed her applications for SSI, POD and DIB, alleging a

disability onset of June 3, 2009, which she later amended to March 1, 2009.  (Transcript

---

[1]    On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of
Social Security.  She is automatically substituted as the defendant in this
case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

("Tr.") 23.)  The applications were denied initially and upon reconsideration, and Plaintiff

requested a hearing before an administrative law judge ("ALJ").  (*Id*.)  On April 27,

2011, an ALJ held Plaintiff's hearing.  (*Id*.)  Plaintiff participated in the hearing, was

represented by counsel, and testified.  (*Id*.)  A vocational expert ("VE") also participated

and testified.  (*Id*.)  On May 26, 2011, the ALJ found Plaintiff not disabled.  (Tr. 23-33.)

On October 16, 2012, the Appeals Council declined to review the ALJ's decision, and

the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On December 19, 2012, Plaintiff filed her complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in

this case.  (Doc. Nos. 19, 20, 21.)  Plaintiff argues that – for various reasons –

substantial evidence does not support the ALJ's determination of her residual functional

capacity ("RFC").

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born on September 23, 1976.  (Tr. 31.)  She had a general

equivalency diploma ("GED") and was able to communicate in English.  (*Id*.)  She had

no past relevant work.  (*Id*.)

### B.   Relevant Medical Evidence[2]

#### 1.   Treatment Notes

In an October 14, 2003 letter to Dr. Patel, neurologist Harold Mars, M.D., noted

---

[2]    The ALJ determined that Plaintiff had the severe mental impairment of
affective disorder and included restrictions in Plaintiff's RFC to account for
the disorder.  (Tr. 26, 29.)  Plaintiff does not challenge the ALJ's
conclusions with respect to her affective disorder.

2

Plaintiff's report that she had been involved in two motor vehicle accidents, one in 1997 and a second in June 2003.  (Tr. 325.)  After the first accident, Plaintiff developed L5-S1 disc problems, as well as episodic residual pain in her lower back that occasionally radiated into her lower extremities.  (*Id*.)  After the second accident, Plaintiff developed pain in her posterior cervical area, radiating into her arms with numbness and tingling.  (*Id*.)  Plaintiff reported daily headaches and diminished memory and concentration.  (Tr. 324-25.)  Dr. Mars's exam revealed tightness and tenderness in Plaintiff's cervical and interscapular areas.  (Tr. 325.)  Dr. Mars diagnosed Plaintiff with cervical and thoracic myofascitis, musculoskeletal headaches, and post-concussive syndrome.  (*Id*.)  Because Plaintiff was four months pregnant at the time, Dr. Mats delayed any further diagnostic procedures.  (*Id*.)  On November 21, 2003, Plaintiff complained to Dr. Mars of pain in her neck that was alleviated by "cracking."  (Tr. 324.)

An April 2004 nerve conduction velocity study of Plaintiff's cervical spine was consistent with early cervical radiculopathy.  (Tr. 590.)  A May 5, 2004 MRI of Plaintiff's cervical spine revealed minimal reversal of the normal lordotic curvature of the cervical spine, as well as focal disc herniations extending from C4-5 through C6-7.  (Tr. 320.)  However, the MRI revealed no impingement on the cervical cord.  (*Id*.)

In a June 3, 2004 letter, Dr. Mars noted Plaintiff's complaints of memory problems and headaches continuing after the automobile accident.  (Tr. 323.)  According to Dr. Mars, Plaintiff underwent traction, but was unable to tolerate more than 20 pounds.  (*Id*.)  In a June 22, 2004, letter, Dr. Mars opined that Plaintiff was "still tight in the cervical paraspinous area," but noted that Plaintiff was engaging in minimal

3

treatment because she was breast feeding.  (Tr. 322.)  He indicated that he had instructed Plaintiff to return to him when she was no longer nursing.  (*Id*.)

In October 2004 and January 2005, George Muenster, D.O, noted Plaintiff's complaint of pain and spasms in her neck and upper back.  (Tr. 341, 347.)  He prescribed a lidoderm patch.  (Tr. 341.)  A May 2005 x-ray of Plaintiff's lumbar spine revealed unilateral spondylosis at L5 without any associated spondylolisthesis.  (Tr. 585.)  In July 2005, Plaintiff reported to Dr. Muenster that her left shoulder was hurting, and that she was having trouble lifting her baby.  (Tr. 344.)  He diagnosed Plaintiff with cervical and shoulder strain, and prescribed Neurontin and Vicodin.  (*Id*.)   Plaintiff continued to complain of neck and shoulder pain, as well as lower back pain, in August 2005.  (Tr. 343 (August 22, 2005), 342 (August 30, 2005.)  Dr. Muenster continued Plaintiff on Neurontin and Vicodin, and prescribed Flexeril.  (Tr. 343, 342.)  His August 30, 2005 examination revealed tenderness and muscle spasm over Plaintiff's paraspinal muscles.  (Tr. 342.)  On September 20, 2005, Plaintiff continued to report low back pain.  (Tr. 339.)  Dr. Muenster's examination revealed mild muscle tenderness over the cervical paraspinal region.  (*Id*.)  He prescribed Vicodin and Ultram.  (*Id*.)

In September 2005, Plaintiff's range of motion in the cervical spine was restricted at 60 degrees in right and left lateral rotation, with normal flexion, extension, and right and left lateral rotation, with pain at the extreme range of motion.  (*Id*.)  She continued to complain of recurring neck and back pain.  (*Id*.)  Dr. Patel opined that Plaintiff's prognosis was "guarded," giving the injuries to her cervical spine as well as her disc herniations at C4-5 through C6-7.  (Tr. 332.)

On September 7, 2005, Plaintiff complained to Dr. Muenster of back pain

4

radiating into her legs, as well as muscle spasms in her neck.  (Tr. 338.)  Examination revealed tenderness over her paraspinal muscles.  (*Id*.)  Dr. Muenster diagnosed Plaintiff with chronic back pain and cervical strain, and prescribed Vicodin.  (*Id*.)  On that same day, Plaintiff presented to the emergency department at Lake Hospital, complaining of lower back and neck pain.  (Tr. 429.)  A physician diagnosed Plaintiff with acute myofascial strain, low back pain and acute sciatica.  (*Id*.)  Plaintiff received Vicodin before being discharged.  (Tr. 430.)

On October 18, 2005, pain management physician Emad A. Mikhail, M.D., examined Plaintiff, noting her complaints of pain in her neck, right shoulder and lower back.  (Tr. 366.)  She described headaches and muscle spasms, and rated her pain at 10 out of 10 without medication and six to seven out of 10 with Vicodin.  (*Id*.)  Dr. Mikhail recommended that Plaintiff undergo cervical facet joint injection blocks.  (Tr. 366-67.)  When Plaintiff requested Vicodin, Dr. Mikhail explained that the injection blocks were the appropriate treatment.  (Tr. 367.)  Plaintiff became "irate" and ended the examination, threatening to contact her attorney.  (*Id*.)  After "hyperventilating in the hallway and displaying a lot of tearful activity," Plaintiff became abusive with staff members at the pain management center and was eventually escorted out of the building by security.  (*Id*.)  Accordingly, Dr. Mikhail did not conduct a physical examination of Plaintiff.  (*Id*.)

Later on October 18, 2005, Plaintiff reported to the emergency department at Euclid Hospital, complaining of back pain.  (Tr. 360.)  She informed the emergency department staff that she had been to the pain management clinic at the hospital that

day and "could not get any cooperation from them regarding treatment for her pain." (*Id*.)  Physicians prescribed Vicodin and Ultram, and discharged Plaintiff.  (Tr. 361.)

On November 1, 2005, pain management physician Dean C. Pahr, D.O., examined Plainitff, noting her complaints of pain in her neck and hip.  (Tr. 392.)  He was able to reproduce pain in Plaintiff's neck by palpitating and flattening the lordotic curve of her cervical spine.  (*Id*.)  Dr. Pahr diagnosed Plaintiff with cervical radiculitis and lumbar spondylosis, and prescribed methadone and relafen.  (Tr. 393.)  In November and December 2005, Plaintiff underwent facet injections at L3-L4, L4-L5, and L5-S1. (Tr. 582, 584.)

On January 3, 2006, Plaintiff reported to Dr. Pahr that she continued to have pain between her shoulder blades and in her neck, but felt that the methadone was decreasing the pain.  (Tr. 389.)  Dr. Pahr diagnosed Plaintiff with fibromyalgia, cervical radiculitis and lumbar spondylosis without myelopathy.  (*Id*.)  He continued Plaintiff on methadone.  (*Id*.)  He instructed her to obtain an x-ray of her neck to check for any misalignment.  (*Id*.)    A January 9, 2006 x-ray of Plaintiff's cervical spine revealed "mild reversal of the lordotic curvature which may be due to muscle spasm," but was "essentially negative."  (Tr. 574.)  On February 2, 2006, Plaintiff reported to Dr. Pahr that she was doing "reasonably well."  (Tr. 388.)  He diagnosed her with fibromyalgia and cervicalgia, and continued her methadone.  (*Id*.)

Dr. Pahr continued Plaintiff on methadone through March and April 2006.  (Tr. 387 (March 29, 2005), 386 (April 14, 2006)).  In April 2006, he noted that Plaintiff was "doing much better now that she is on her maintenance pain medication."  (Tr. 386.)  He

6

added Flexeril after Plaintiff complained of spasms.  (*Id*.)  In May 2006, Plaintiff complained of "some" pain, and Dr. Pahr continued her methadone.  (Tr. 385.)  He noted that Plaintiff's pain was "managed quite well with her medications at this time."  (*Id*.)  In August 2006, Plaintiff reported that she was "doing well," and rated her pain at six to seven out of 10.  (Tr. 384.)  She complained of pain across the posterior aspect of her neck, radiating into her lower back.  (*Id*.)  Dr. Pahr diagnosed her with cervical spondylosis without myelopathy.  (*Id*.)  He continued her methadone.  (*Id*.)  In September 2006, Dr. Pahr opined that Plaintiff was "not . . . employable at this point."  (Tr. 449.)  He noted that she was attempting to make arrangements to attend college courses, and did not complain of any new pain.  (*Id*.)  Plaintiff continued to report pain in her neck, shoulders and legs.  (*Id*.)

On October 20, 2006, Plaintiff underwent a functional assessment at the request of Dr. Pahr, performed by occupational therapist Maria Hodge.  (Tr. 575-81.)  Ms. Hodge noted that the results of the assessment were "conditionally valid," meaning that the "results represent the levels [Plaintiff] perceives as [her] capability, even though [Plaintiff] can physically do more."  (Tr. 575.)  During the assessment, Plaintiff demonstrated the ability to: occasionally lift six pounds above her shoulders bilaterally; occasionally lift 8.2 pounds from a desk to a chair bilaterally; occasionally push and pull 6.7 pounds; frequently maintain static position in her neck; and occasionally flex and rotate her head and shoulders.  (Tr. 581.)  On October 31, 2006, Dr. Pahr noted that he was encouraging Plaintiff to "get as much activity as she can, including climbing a flight of stairs to use her bathroom and do her laundry."  (Tr. 448.)

7

During examinations in 2007, Dr. Pahr noted that Plaintiff had weaned herself off of her various medications, including methadone and antidepressants.  (Tr. 446 (October 2007), 445 (December 2007).)  Dr. Pahr described Plaintiff as "doing very well" with no changes in her physical examination.  (Tr. 445, 446.)

In February 2008, Dr. Pahr noted Plaintiff's report that she had no new pains, and that she was working at Marc's.  (Tr. 444.)  Plaintiff was taking Percocet for pain and Zomig to control migraines.  (*Id*.)  In April 2008, Plaintiff reported an instance of difficulty raising her head off of the bed, followed by neck pain.  (Tr. 443.)  Dr. Pahr opined that Plaintiff was experiencing muscle spasms, noting that there were no neurological deficits.  (*Id*.) In July 2008, Dr. Pahr reported that Plaintiff was "doing very well," and that her condition was "very stable."  (Tr. 442.)  In October 2008, Plaintiff complained of pain across her back, but reported no new pains.  (Tr. 441.)

In January 2009, Plaintiff reported that the Percocet gave her relief, but lasted for only four hours.  (Tr. 440.)  Facet injections gave her temporary relief, but only for a few weeks.  (*Id*.)  Dr. Pahr recommended that she obtain a lumbar MRI.  (*id*.)  A February 2009 MRI of Plaintiff's lumbar spine revealed a small disc protrusion at T10-T11, and degenerative arthritis in the facet joints at L5-S1.  (Tr. 552.)

In April 2009, Dr. Pahr noted that Plaintiff was doing "reasonably well."  (Tr. 439.) His review of her most recent MRI revealed "really no significant change in the last 4-1/2 years."  (*Id*.)  In July 2009, Dr. Pahr observed that Plaintiff was "doing very well," despite having been laid off from her job.  (Tr. 438.)  She reported that she continued to experience pain, but Dr. Pahr characterized it as "under good control."  (*Id*.)  Plaintiff

was compliant with her medication regimen and was looking for employment.  (*Id*.)

In October 2009, Plaintiff reported to Dr. Pahr that she was working part time as a school lunch lady.  (Tr. 544.)  She continued to have pain, stress and spasms in her neck, which resulted in migraine headaches.  (*Id*.)  Dr. Pahr noted "very significant spasm" in Plaintiff's paraspinal muscles on the right side of her neck.  (*Id*.)  He diagnosed her with myalgia, cervicalgia, and lumbar spodylosis without myelopathy.  (*Id*.)  Plaintiff underwent a trigger point injection on the right side of her neck.  (*Id*.)  He instructed Plaintiff to continue her Percocet, and to perform exercises designed to stretch and strengthen the muscles that support her cervical spine.  (*Id*.)  He prescribed Relpax for her migraine headaches.  (*Id*.)

On April 25, 2011, Dr. Pahr completed a pain questionnaire, in which he opined that Plaintiff's myalgia and migraine headaches were capable of producing pain.  (Tr. 703.)  He summarized her subjective complaints as "chronic pain syndrome."  (*Id*.)  In response to a question regarding whether the "intensity and persistence of the pain" affected Plaintiff's ability to do basic work-related activities, Dr. Pahr wrote, "yes, daily pain," and opined that Plaintiff's pain was "often" severe enough to interfere with her attention and concentration.  (*Id*.)

### 2. Agency Reports

In May 2009, agency consulting physician W. Jerry McCloud performed a physical residual functional capacity ("RFC") assessment.  (Tr. 530-37.)  He opined that Plaintiff could: occasionally lift 20 pounds and frequently lift 10 pounds; and stand, walk and sit for a total of about six hours in eight-hour workday.  (Tr. 531.)  Dr. McCloud

9

assigned Plaintiff no limitation in her ability to push and/or pull.  (*Id*.)  Dr. McCloud

opined that Plaintiff could occasionally kneel, crouch, crawl, and reach overhead; and

should never climb ladders, ropes or scaffolds.  (Tr. 532.)  Dr. McCloud limited Plaintiff

to occasional overhead reaching bilaterally, but concluded she had an unlimited ability

to handle, finger and feel.  (Tr. 533.)  With respect to whether Plaintiff's allegations

regarding the severity of her symptoms were consistent with the medical evidence, Dr.

McCloud opined:

> [Plaintiff] has cervical and lumbar [degenerative disc
> disease] which can reasonably cause pain and discomfort.
> Exam findings show, however that she has no n[e]urological
> deficits other than mild cervical radiculopathy.  She is able to
> ambulate without aids and perform basic [activities of daily
> living].  Allegations are credible in nature but not severity.

(Tr. 535.)

On December 1, 2009, agency consulting physician Elizabeth Das, M.D.,

affirmed Dr. McCloud's RFC assessment.  (Tr. 598.)

**C.     Hearing Testimony**

**1.      Plaintiff's Hearing Testimony**

At her April 27, 2011 administrative hearing, Plaintiff testified as follows:

She was unable to work due to "problems with [her] low back and beck, which

also spread to other areas of [her] body, [her] appendages, including [her] right arm and

left leg." (Tr. 49.)  She experienced stiffness in her neck, and had undergone numerous

treatments to "get the muscles relaxed even a little bit." (*Id*.)  In response to the ALJ's

observation that most of her medical records reflected "pretty minor issues," Plaintiff

stated that she experienced muscle spasms and low back pain as a result of a birth

defect in her back, and that she had degenerative disc disease caused by a whiplash injury she sustained in one of the two automobile accidents in which she had been involved.  (Tr. 50.)  Plaintiff drove herself to urgent care immediately after the first accident and went to urgent care one day after the second accident.  (Tr. 52.)  Plaintiff also experienced migraines a couple times each week.  (Tr. 50.)

Plaintiff had two sons: a 14-year old who lived with her half of the time, and a seven-year old who lived with her all of the time.  (Tr. 53.)  She felt that her depression and physical limitations affected their lives and her relationship with them.  (Tr. 54.) Plaintiff supported herself and her sons, in part, by using child support for her younger son.  (Tr. 55.)  She was able to drive.  (*Id.*)

Plaintiff had many days where she was not able to get out of bed because of migraine headaches and body pains.  (Tr. 56-57.)  She lamented having to miss church because of her pain.  (Tr. 57.)  Plaintiff took five Percocets each day.  (Tr. 64.)  On a typical day, Plaintiff got out of bed to take her son to school, and then went back to bed after she returned home.  (Tr. 68-69.)  She watched television, did some stretches, and drank coffee.  (Tr. 69.)  Plaintiff was able to do laundry, and could comfortably lift 10 pounds at a time.  (*Id.*)  She could stand for 15 to 45 minutes and could sit for 30 to 45 minutes.  (Tr. 69-70.)  Plaintiff was not capable of vacuuming or doing dishes because of the repetitive movement, and she experienced pain when she raised her arms above her head.  (Tr. 72.)

Plaintiff could not move her neck "all the way side to side," and had to slowly turn her body in order to look to the side.  (Tr. 73.)  She heard a cracking noise when she looked down and moved her head from side to side.  (*Id.*)  No physician had been able

11

to explain the cause of the noise.  (*Id*.)  Plaintiff had been fired from a job as a cashier because she was rude to customers, and she felt that she had a bad attitude because she was in pain.  (Tr. 74.)  Her job as a lunch lady ended because she was missing a lot of work due to her physical problems.  (Tr. 79.)

    **2.**    **Vocational Expert's Hearing Testimony**

The ALJ described a hypothetical individual of Plaintiff's age and work history, with the following physical limitations, based on Dr. McCloud''s findings in his May 2009 physical RFC assessment:

> Lifting and carrying, including upward pulling, 20 pounds occasionally, 10 pounds frequently; standing, walking, sitting with normal breaks six out of eight hours; unlimited pushing and pulling, including hand/foot controls within those exertional limitations; no climbing of ladders, ropes or scaffolds; occasional kneeling, crouching and crawling; occasional reaching all directions, including overhead; and there are no visual, communicative or environmental limitations. . . . The individual is able to perform simple to moderately complex tasks with limited social contact.

(Tr. 84-85.)  The VE opined that the limitations on reaching and social contact excluded many jobs:

> The other job[s] I'm looking at, your honor, usually one or the other of the two is exceeded, most importantly the reaching.  There are 12,741 Dictionary of Occupational Titles of course representing millions of jobs throughout the country.  If you're limit[ed to] bilateral occasional reaching, there only about a hundred of those occupations where that's not required.  So you're really . . . in a very, very diminished database off the starting blocks with occasional bilateral reaching.

(Tr. 86-87.)  The ALJ asked the VE whether there were jobs available to an individual who was limited to frequent reaching in all directions, including overhead.  (Tr. 87.)  The

VE opined that such an individual could perform work as a housekeeper, of which there were 910 jobs in the local economy and 120,000 nationally; packager, of which there were 570 jobs locally and 80,000 in the national economy; and non-post office mail clerk, with 870 local jobs and 110,000 nationally.  (Tr. 87-88.)  In response to Plaintiff's counsel's question, the VE opined that an individual who was limited to occasional neck movements would be unable to sustain work.  (Tr. 88-89.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905

13

F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

In her September 16, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1. Plaintiff meets the insured status requirements of the Act through June 30, 2011.

2. Plaintiff has not engaged in substantial gainful activity since June 3, 2003, the alleged onset date.

3. Plaintiff has the following severe impairments: discogenic and degenerative spinal disease, migraine headaches, and an affective disorder.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the RFC to perform light work except that Plaintiff should not engage in climbing ladders, ropes or scaffolds; can perform occasional kneeling, crouching, and crawling; can frequently reach in all directions; and is under no visual, communicative or environmental limitations.  She is mentally able to perform simple to moderately complex tasks involving limited social contact.

14

6.      Plaintiff has no past relevant work.

7.      Plaintiff was born on September 23, 1976 and was 26 years old, which is defined as a younger individual age 18049, on the alleged disability onset date.

8.      Plaintiff has at least a high school education and is able to communicate in English.

* * *

10.     Considering Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Act, from June 3, 2003, through the date of the ALJ's decision.

(Tr. 25-32.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

15

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

Plaintiff argues that substantial evidence does not support the ALJ's decision because the ALJ's RFC failed to account for Plaintiff's limited ability to move her neck and upper extremities; and because the ALJ improperly assessed her allegation of disabling pain, and failed to assign weight to the opinion of her treating physician. The Commissioner generally argues that substantial evidence supports the ALJ's decision.

**1.      The RFC**

Plaintiff contends that the ALJ's hypothetical questions to the VE did not sufficiently account for her limitations because the ALJ failed to include restrictions on Plaintiff's ability to move her neck and to reach bilaterally with her upper extremities.[3]

---

[3]      Plaintiff first raised the argument regarding her ability to reach in her reply brief, rather than in her brief on the merits. (*See* Reply Br. at 2-5.) Although this Court can deem such arguments waived, *see Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1007 (6th Cir. 2009), on August 8, 2013, the Court directed the Commissioner to file a supplemental brief addressing this issue. (Doc. No. 22.) The Commissioner complied with this Court's order and filed a supplemental brief on August 14, 2013. (Doc. No. 23.) Counsel for Plaintiff he should not expect similar leniency

16

###### a.    Neck Movement

According to Plaintiff, the record reflects that she was limited to no more than occasional neck movements, and, because the VE testified that an individual with that limitation would be incapable of sustaining work, the ALJ's failure to include this restriction prejudiced her.  Plaintiff points to instances in the record reflecting Plaintiff's limited range of motion in her neck to support her argument.

Plaintiff's argument on this point lacks merit, as substantial evidence supports the ALJ's determination of Plaintiff's RFC with respect to this issue.  Although the record contains evidence of Plaintiff's subjective complaints of pain and a limited range of cervical motion, no treating or examining source opined that Plaintiff was limited in her ability to move her neck.  Rather, as Dr. McCloud noted in his report, although Plaintiff complained of pain in her neck, her exams were "generally normal."  (Tr. 532.)  Further, as noted by the ALJ, the reversal of Plaintiff's cervical spine was described as "minimal" (tr. 320, 574), and Plaintiff points to nothing in the record reflecting a diagnosis that could reasonably explain her alleged inability to move her neck.  In sum, Plaintiff identifies no objective medical evidence the record supporting her claim that the ALJ erred in omitting a neck movement limitation from her RFC.  Because substantial evidence supports the ALJ's conclusion on this issue, this argument lacks merit.

---

regarding this matter in the future.  Moreover, the failure to include all arguments in Plaintiff's Brief on the Merits deprives the Commissioner of the opportunity to determine at an early stage whether opposition to Plaintiff's claim is substantially justified.  It may be appropriate for this Court to consider this piecemeal approach to briefing as one factor bearing on any claims for attorney fees in this case.

### b.    Reaching

Plaintiff also argues that the ALJ erred in failing to include restrictions limiting Plaintiff to occasional bilateral reaching with her upper extremities, contending that the ALJ failed to include any such limitation despite the fact that state agency consulting physicians determined that it was appropriate.  The Commissioner argues that Plaintiff mischaracterizes the opinions of the consulting physicians, and asserts that there is no material difference between the ALJ's RFC and the reaching limitations assigned by Drs. McCloud and Das.

In his RFC assessment, Dr. McCloud opined, in relevant part, that Plaintiff was "limited" in her ability to reach in all directions, and should be restricted to "no more than occasional kneeling, crouching, crawling or overhead reaching," and noted, later in the assessment, "[o]verhead reaching limited to occ[asionally] bilaterally."  (Tr. 532, 533.) Dr. Das confirmed Dr. McCloud's RFC assessment.  (Tr. 598.)  During his questioning of the VE, the ALJ initially proposed a hypothetical individual who was limited to "occasional reaching in all directions, including overhead."  (Tr. 85.)  After the VE testified that such a limit precluded an individual from working in many jobs, the VE changed the hypothetical to allow for "frequent reaching in all directions, including overhead."  (Tr. 87.)  In his decision, the ALJ described the reports of Drs. McCloud and Das as "the most persuasive and the only specific medical . . . evidence of record which provides specific limitations."  (Tr. 31.)  However, in his determination of Plaintiff's RFC, the ALJ limited her to "frequently reach[ing] in all directions," without explaining his decision not to adopt the reaching limitations recommended by the consulting physicians.  (Tr. 29.)

18

Plaintiff argues that the ALJ erred in failing to adopt, or to explain why he did not adopt, the reaching limitations assigned by the state agency consultants.  The Commissioner contends that Plaintiff's argument lacks merit because the RFC determined by the ALJ is not materially inconsistent with the RFC assigned by the state consultants.  Specifically, the Commissioner notes that Drs. McCloud and Das only limited Plaintiff to occasional *overhead* reaching, not reaching in all directions.  The Commissioner's argument lacks merit.  Although the state consultants did not specify a limit on Plaintiff's reaching in all directions, they did specify one direction – overhead – in which she was limited to occasional reaching.  The ALJ's RFC permits frequent reaching in all directions, including overhead.  Accordingly, the ALJ's RFC is less restrictive than the RFC determined by the state consultants.[4]

---

[4] The Commissioner cites to two cases to argue that, because overhead reaching is only one element in the full range of reaching, the ALJ's RFC was not materially inconsistent with the state consultants' opinion.  None of the cases actually stand for that proposition as a matter law.  Rather, the holding of each case is specific to its facts.  In *Falcon-Cartagena v. Comm'r of Soc. Sec.*, 21 F. App'x 11, 14 (1st Cir. 2001), the claimant was unable to perform tasks requiring constant reaching overhead with the left arm.  The ALJ concluded – and the First Circuit agreed –  that, because this specific ability was "only a narrow subset of the full range of reaching," and because "the ALJ's characterization of the claimant's limitation was [not] understated," the claimant's reaching restriction had "only a marginal effect on the relevant occupational base."  *Id*.  In this case, given the lack of explanation for the ALJ's decision to expand Plaintiff's reaching ability beyond that suggested by the agency consultants,  the ALJ may have overstated Plaintiff's ability to reach and, thus, the reasoning of the First Circuit does not apply.  In *Seamon v. Astrue*, 364 F. App'x 243, 249 (7th Cir. 2010), the Seventh Circuit addressed two specific DOT Listings not relevant to this case, and concluded, that, although there was evidence that each required lateral reaching, there was no evidence that either position required frequent overhead reaching.  Because these two Listings are not at issue in this case, the reasoning of the Seventh Circuit does not apply here.

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts her RFC finding, an ALJ must explain why she did not include its limitations in her determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, the ALJ did not discuss why he omitted the overhead reaching limitation assigned to Plaintiff by the state consultants.  Because the ALJ's calculation of Plaintiff's RFC was less restrictive than the consultants' limitations, the two sets of restrictions contradicted one another, and S.S.R. 96-8p required the ALJ to explain his decision not to include the overhead reaching limitation in Plaintiff's RFC.  The Commissioner argues that substantial evidence supports the ALJ's determination of Plaintiff's RFC, including the frequent overhead reaching limitation.  However, the requirement of S.S.R. 96-8p is clear: where an ALJ's RFC conflicts with a medical source opinion in the record, the ALJ must explain why that opinion was not adopted.

The Commissioner argues that Plaintiff's argument lacks merit because evidence

20

in the record supports the ALJ's determination that Plaintiff was capable of frequent

reaching in all directions.  Specifically, the Commissioner points to Adult Function

Reports completed by Plaintiff in April and October 2009, in which she did not indicate

that her impairments affected her ability to reach.  (Tr. 251, 294.)[5]  The Court agrees

that there is evidence in the record that Plaintiff had the reaching capabilities described

in the ALJ's RFC.  That evidence makes this question in this case a close one.

However, the ALJ did not discuss his decision to omit the limitation suggested by the

state consultants, and relying on other information in the record to explain that omission

would require this Court to engage in the *post hoc* rationalization that case law clearly

prohibits.  *See* *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished

opinion) ("[A] simple but fundamental rule of administrative law . . . is . . . that a

reviewing court, in dealing with a determination or judgment which an administrative

agency alone is authorized to make, must judge the propriety of such action solely by

the grounds invoked by the agency. If those grounds are inadequate or improper, the

court is powerless to affirm the administrative action.") (internal citations omitted).

Finally, there is merit to Plaintiff's argument that she was prejudiced by the ALJ's

decision not to adopt the reaching limitation assigned by the state consultants.  During

the administrative hearing in this case, the VE testified that an individual who was

limited to occasional reaching in all directions would be precluded from working in the

majority of jobs.  He did not, however, specify whether an individual who was limited to

---

[5]     Although Plaintiff did not indicate that her impairments limited her ability to
        reach, elsewhere in each Report, she did describe difficulty caring for her
        hair because she could "only brush for a minute or two" (tr. 248), and
        "brush[ed] as little as humanly poss[ible] (tr. 291.)

occasional overhead reaching would also be precluded from many jobs.  Nor did he discuss whether such an individual would be able to work in the positions he identified as appropriate for an individual who could frequently reach in all directions. Accordingly, Plaintiff is entitled to remand on this point.  On remand, the ALJ should either adopt the overhead reaching limitation assigned by the state consultants, or explain his decision not to adopt; and, if he does adopt the limitation, the ALJ should conduct an additional hearing to determine whether an individual with that limitation would be precluded from working in a jobs available in the national economy.

### 2.      Plaintiff's Complaints of Pain

Plaintiff contends that the ALJ erred in assessing her complaints of disabling pain.  There is no dispute that pain alone may be sufficient to constitute a disability. *See, e.g., Kirk v. Sec.y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). When a claimant complains of disabling pain, an ALJ must apply the two-step test set forth in *Duncan v. Sec'y of Health & Human Servs*, 801 F.2d 847, 853 (6th Cir. 1986), to determine the credibility of such complaints.  The *Duncan* test requires an ALJ to, first, examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain; and, second, if there is such an underlying condition, examine whether the objective medical evidence confirms the alleged severity of the pain or, alternatively, whether the objectively established medical condition is of such a severity that it can be reasonably expected to produce the alleged severity of pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan*, 801 F.2d at 853).  An ALJ must consider all of the relevant evidence, including:

(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's alleged pain; (3) precipitating and aggravating factors; (3) the type, dosage, effectiveness and side effects of medications taken to alleviate the pain; (5) treatments other than medications that the claimant has received to relieve the pain; and (6) any other measures that the claimant takes to relieve the pain.  *Id*. at 1039-40 (citing 20 C.F.R. § 404.1529(c)).

In his decision, the ALJ correctly described the two-step process in which he was required to engage in assessing the credibility of Plaintiff's complaints of pain.  (Tr. 29.) Then, the ALJ concluded that Plaintiff "has largely failed to meet the first step in the two-step process . . . as it is not shown that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce [Plaintiff's] report pain and other symptomatology."  (Tr. 30.)  Then, ALJ pointed to several bases for concluding that Plaintiff's complaints of pain were not consistent with the evidence in the record.  (Tr. 30-31.)  These included: (1) the fact that Plaintiff maintained a regular daily job for over one year; (2) repeated neurological and physical evaluations failed to account for her complaints; and (3) the record reflected a "lack of any clinically documented basis" for her complaints. (Tr. 30-31.)  Specifically, the ALJ noted that none of the opinions of Plaintiff's treating and consulting physicians "endorse[d] disability."  (Tr. 31.)

Plaintiff argues that the ALJ erred in finding that no medically determinable impairment could reasonably cause Plaintiff's pain.  Specifically, Plaintiff contends that the ALJ's conclusion on this issue is inconsistent with his conclusion, as step two of the sequential analysis, that Plaintiff had severe impairments.  This argument lacks merit.

23

Although it is not necessarily an error for an ALJ to determine both that a claimant has severe impairments and that no medically determinable impairment reflected in the record could cause the claimant's pain, that it is not what happened in this case. Rather, the ALJ determined that Plaintiff "largely failed" to meet the requirements of the first step in the *Duncan* test, but then continued to engage in the analysis required by the second step.  In other words, to the extent that the ALJ erred in not conclusively identifying a medically determinable impairment, that error was harmless because the ALJ completed the analysis by considering whether medical or other evidence confirmed Plaintiff's complaints of pain.

Further, to the extent Plaintiff argues that the ALJ erred by not considering all of the *Duncan* factors, that argument lacks merit.  It is well established that an ALJ may satisfy the *Duncan* test by considering most, if not all, of the relevant factors.  *Bowman v. Chater*, 132 F.3d 32, 1997 WL 764419, *4 (6th Cir. Nov. 26, 1997) (unpublished *per curiam* opinion).  Accordingly, this argument presents no basis for remand in this case.

### 3.    Treating Physician

Finally, Plaintiff contends that the ALJ erred in failing to assign weight to the opinion of her treating physician, Dr. Pahr.  Specifically, Plaintiff points to Dr. Pahr's April 2011 pain questionnaire, in which he opined that Plaintiff's myalgia and migraine headaches were capable of producing pain, and summarized Plaintiff's subjective complaints as "chronic pain syndrome."  (Tr. 703.)[6]

---

[6]    Plaintiff raises this argument in the section of her brief in which she addresses the ALJ's *Duncan* analysis.  Accordingly, this Court construes Plaintiff 's argument as addressing Dr. Pahr's opinion within the context of the *Duncan* analysis.  Any argument that Dr. Pahr's opinion is relevant to

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

Plaintiff contends that because Dr. Pahr was her treating physician, his opinion was entitled to controlling weight, and the ALJ erred in failing either to assign controlling weight to Dr. Pahr's April 2011 opinion or to explain the weight assigned to it.  The Commissioner contends that the April 2011 questionnaire from Dr. Pahr does not constitute a medical opinion such that it was entitled to controlling weight.  However, this Court need not decide this issue because, even if Dr. Pahr's April 2011 response to the medical questionnaire is a medical opinion entitled to controlling weight, it is not relevant or material to the outcome of Plaintiff's case.  In this case, in his April 2011 response, Dr. Pahr opined that Plaintiff had myalgia and migraine headaches that caused her pain, as well as chronic pain syndrome.  Dr. Pahr's opinion is relevant only to the first part of the *Duncan* test – whether an underlying medical condition caused Plaintiff pain.

---

the larger issue of whether Plaintiff was capable of performing work-related activities would be inconsistent with Plaintiff's contention that restrictions on her ability to move her neck or reach limit her ability to work, as Dr. Pahr's opinion does not include these specific limitations.

25

Although the ALJ opined that Plaintiff lacked evidence to support such a finding, he moved on to the second step in the *Duncan* analysis and determined that Plaintiff's complaints regarding the severity of pain were not credible.  Thus, even if the ALJ assigned controlling weight to Dr. Pahr's opinion – and found that her impairments could cause her pain – that conclusion would not change the outcome of Plaintiff's case. Accordingly, any error is harmless.[7]

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REMANDED for proceedings consistent with this Opinion and Order.


**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: August 26, 2013

---

[7]      Although federal courts cautiously apply the harmless error analysis in the context of administrative review, this Court has concluded that the analysis is appropriate where, "'based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.'" *Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10-CV-1196, 2011 WL 2461339 * 10 (N.D. Ohio June 17, 2011) (White, Mag. J.) (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)); *see also Darabed v. Astrue*, No. 1:10-CV-2626, 2011 WL 7456148, *6 (NM.D. Ohio Dec. 6, 2011) (Burke, Mag. J.) ("Application of harmless error may be appropriate where a review of the material that the ALJ did consider leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner.")